DSS:CAC
F. #2011R0670

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M-11-454**

- - - - - - - - - - - - - - - - -X

IN THE MATTER OF THE SEARCH OF
THE FACEBOOK ACCOUNT ASSOCIATED
WITH THE NAME MARS BOUND MCKENZIE

<u>TO BE FILED UNDER SEAL</u>

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
SEARCH WARRANT

(T. 21, U.S.C., §§ 841,
846, 952 and 963; T. 18,
U.S.C., §§ 924(c),
924(j) and 1951. )

- - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

   SCOTT F. BYERS, being duly sworn, deposes and says:

   1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.  As such, I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.    I make this affidavit in support of an application
for a search warrant for a Facebook account that is stored at a
premises owned, maintained, controlled, or operated by Facebook,
a social networking company headquartered at 151 University
Avenue, Palo Alto, California, 94301.  This affidavit is made in
support of an application for a search warrant under 18 U.S.C. §§
2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to
disclose to the government records and other information in its
possession, pertaining to the subscriber or customer using this
website.

3.    Among other duties, I am participating in an
investigation relating to narcotics trafficking and Hobbs Act
robberies, including two homicides in connection with a Hobbs Act
robbery by an individual known as Khaa Mckenzie ("McKenzie") and
others.  As further detailed below, a confidential source ("CS1")
who knows McKenzie has regularly corresponded with him on CS1's
Facebook account regarding among other things, weapons and, most
recently, regarding McKenzie's involvement in two homicides and a
robbery of narcotics.  Upon reviewing CS1's Facebook account, I
determined that CS1 was communicating with McKenzie via a
Facebook account in the name "Mars Bound Mckenzie," (the "SUBJECT
FACEBOOK ACCOUNT"), and that these communications constitute
evidence and instrumentalities of narcotics trafficking and Hobbs
Act robberies, in violation of Title 21, United States Code,

Sections 841, 846, 952 and 963, and Title 18, United States Code, Sections 924(c), 924(j) and 1951.

       4.   Accordingly, upon information and belief, there is probable cause to believe that the SUBJECT FACEBOOK ACCOUNT contains evidence and instrumentalities of narcotics trafficking and Hobbs Act robberies, in violation of Title 21, United States Code, Sections 841, 846, 952 and 963, and Title 18, United States Code, Sections 924(c), 924(j) and 1951.

I.   **Introduction and Background**

       5.   I have been an FBI Special Agent for approximately 10 years and am currently assigned to Squad C-23, where I am tasked with investigating narcotics trafficking, money laundering and robberies.   Throughout my career, I have conducted executions of search warrants and during my tenure with FBI, I have been involved in numerous narcotics and robbery investigations.

       6.   I have personally participated in the FBI investigation of the offenses referred to above, and from my personal participation in this investigation and from reports made to me by other law enforcement officers, I am familiar with the facts and circumstances of this investigation.   Because this Affidavit is being submitted for the limited purpose of seeking search warrants, I have not set forth each and every fact learned during the course of this investigation, but simply those facts which I believe are necessary to establish probable cause to

support the issuance of a search warrant of the SUBJECT FACEBOOK
ACCOUNT.  Except where otherwise noted, all conversations
described in this Affidavit are set forth in part and in
substance only.

## II.  Background Regarding Computers, the Internet, and E-mail

      7.    Based on my training, experience and
knowledge, I know the following:

      a.  The Internet is a worldwide network of computer
systems operated by governmental entities, corporations, and
universities.  In order to access the Internet, an individual
computer user must subscribe to an access provider, which
operates a host computer system with direct access to the
Internet.  The world wide web ("www") is a functionality of the
Internet which allows users of the Internet to share information;

      b.  With a computer connected to the Internet, an
individual computer user can make electronic contact with
millions of computers around the world.  This connection can be
made by any number of means, including modem, local area network,
wireless and numerous other methods; and

      c.  E-mail is a popular form of transmitting
messages and/or files in an electronic environment between
computer users.  When an individual computer user sends an e-
mail, it is initiated at the user's computer, transmitted to the
subscriber's mail server, then transmitted to its final

destination.  A server is a computer that is attached to a
dedicated network and serves many users.  An e-mail server may
allow users to post and read messages and to communicate via
electronic means.

III. **Facebook**

       8.  Based on my training and experience, I have
learned the following about Facebook:

       a.  Facebook owns and operates a free-access social
networking website of the same name that can be accessed at
http://www.facebook.com.  Facebook allows its users to establish
accounts with Facebook, and users can then use their accounts to
share written news, photographs, videos, and other information
with other Facebook users, and sometimes with the general public.

       b.  Facebook asks users to provide basic contact
information to Facebook, either during the registration process
or thereafter.  This information may include the user's full
name, birth date, contact e-mail addresses, physical address
(including city, state, and zip code), telephone numbers, screen
names, websites, and other personal identifiers.  Facebook also
assigns a user identification number to each account.

       c.  Facebook users can select different levels of
privacy for the communications and information associated with
their Facebook accounts.  By adjusting these privacy settings, a
Facebook user can make information available only to himself or

herself, to particular Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

      d.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

      e.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also

includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that typically be visible to anyone who can view the user's profile.

f.   Facebook has a Photos application, where users can upload an unlimited number of albums and photos.   Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video.   When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.   For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

g.   Facebook users can exchange private messages on Facebook with other users.   These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.   Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

g.   Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

h.   The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

h.   Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

i.   In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

j.   Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group

identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

        k.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

        l.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well

records of any actions taken by the provider or user as a result of the communications.

         m.    Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application.

**IV.**  **<u>Stored Wire and Electronic Communication Access</u>**

        10.    Title 18, United States Code, Chapter 121, Sections 2701 through 2712, is titled the "Stored Communications Act" ("SCA"). Section 2703 of the SCA sets forth the procedure that federal and state law enforcement officers must follow to compel disclosure of various categories of stored records from network service providers. As shown from the following provisions of Section 2703, the government may compel disclosure of all stored content and records or other information pertaining to a customer or subscriber of an electronic communication service or remote computer service pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

         a.    Title 18, United States Code, Section 2703(a) provides, in part:

A governmental entity may require the disclosure by a
provider of electronic communication service[1] of the
contents of a wire or electronic communication, that is
in electronic storage in an electronic communications
system for one hundred and eighty days or less, only
pursuant to a warrant issued using the procedures
described in the Federal Rules of Criminal Procedure
(or, in the case if a state court, issued using state
warrant procedures) by a court of competent
jurisdiction.[2]  A governmental entity may require the
disclosure by a provider of electronic communications
services of the contents of a wire or electronic
communication that has been in electronic storage in an
electronic communications system for more than one
hundred and eighty days by the means available under
subsection (b) of this section.

---

[1]      "Electronic communication service" is defined as
"any service, which provides to users thereof the ability to
send or receive wire or electronic communications."  18
U.S.C. § 2510(15).  "Electronic communication" is defined as
"any transfer of signs, signals, writing, images, sounds,
data, or intelligence of any nature transmitted in whole or
in part by a wire, radio, electromagnetic, photoelectronic
or photooptical system that affects interstate or foreign
commerce."  18 U.S.C. § 2510(12).  "Electronic storage" is
defined as "(A) any temporary, intermediate storage of a
wire or electronic communication incidental to the
electronic transmission thereof; and (B) any storage of such
communication service for the purposes of backup protection
of such communication."  18 U.S.C. § 2510(17).  An
"electronic communications system" is defined as "any wire,
radio, electromagnetic, photo optical or photo electronic
facilities for the transmission of electronic
communications, and any computer facilities or related
electronic equipment for the electronic storage of such
communications."  18 U.S.C. § 2510(14).

[2]      "Judge of competent jurisdiction" is defined in
relevant part as "(a) a judge of the United States district
court or a United States Court of Appeals."  18 U.S.C. §
2510(9).

(Emphasis added).   In other words, the government must obtain a search warrant to view the contents of a person's e-mail that has been in an ISP's computer system for less than 180 days.[3]

        b.   Title 18, United States Code, Section 2703(b) provides, in part:

> (1) A governmental entity may require a provider of remote computing service to disclose the contents of any electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection -
>
> > (A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, issued using State warrant procedures) by a court of competent jurisdiction. . . .
>
> (2) Paragraph (1) is applicable with respect to any wire or electronic communication that is held or maintained on that service -
>
> > (A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and
> >
> > (B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

---

    [3]   The statute provides that the government may use a subpoena to obtain the content of e-mail that has been on the ISP's computer system for more than 180 days.   See 18 U.S.C. § 2703(a)-(b).

        c.   The government may also obtain records
relating to e-mail communications, such as subscriber identifying
information and header information, by way of a search warrant.
See 18 U.S.C. § 2703(c)(1)(A).

## VI.  Facts Supporting Probable Cause

        9.   McKenzie was identified as a member of a
narcotics conspiracy that is being investigated in the Middle
District of Pennsylvania.  During the course of that
investigation, the FBI received information about the
organization from a cooperating source ("CS2"), who has proven to
be reliable in the past and whose information has been
corroborated by independent evidence.  CS2 was initially involved
in this narcotics conspiracy, but has been cooperating with the
FBI since March 2011.  In February 2011, when CS2 was still a
co-conspirator, McKenzie provided CS2 with an address in New York
where cocaine shipped from Colombia could be received before
being transported to Pennsylvania.  The narcotics shipped to that
address was intercepted en route by law enforcement.  Three
members of this narcotics conspiracy were eventually indicted in
the Middle District of Pennsylvania.  McKenzie has not yet been
charged.

10.   CS2 will likely be charged for his role in the conspiracy, and is cooperating with authorities in the hopes of obtaining a lesser sentence.   CS2 has a criminal record, including convictions for both violent acts and fraud.   CS2 knew McKenzie from his involvement in the conspiracy and provided information about him, among other people.   For example, as set forth above, CS2 provided information about a package of cocaine that had been shipped to McKenzie's residence by Federal Express. Based on that information, law enforcement was able to intercept the package.

11.   On April 6, 2011, two men were found bound in duct tape with their hands tied behind their backs, gagged and shot to death in the basement of a home in the Bedford-Stuyvesant section of Brooklyn.

12.   On April 12, 2011, at the direction of FBI agents, CS2 contacted McKenzie on a cell phone to set up a meeting in order to speak about the cocaine that was recently supposed to be shipped to McKenzie but was seized (discussed above), and to arrange for a purchase of marijuana.   Thereafter, on that same day, CS2 along with CS1 met with McKenzie, and this meeting was recorded.

13.   During the April 12, 2011 meeting, McKenzie told CS1 and CS2 that he and two others had killed two men and robbed them of marijuana and drug proceeds.   McKenzie provided details

of the murder, and told CS1 and CS2 that he had tortured the
victims until they provided the address of a drug stash house.

14. CS1 regularly corresponds with McKenzie on the
SUBJECT FACEBOOK ACCOUNT. CS1 knows that the user of the SUBJECT
FACEBOOK ACCOUNT is McKenzie based on the fact that McKenzie's
photograph is on the SUBJECT FACEBOOK ACCOUNT's profile page, and
the user name is "Mars Bound McKenzie." On April 28, 2011, CS1
and I logged into CS1's Facebook account. While reviewing CS1's
Facebook page, CS1 received a message from the SUBJECT FACEBOOK
ACCOUNT. CS1, at my direction, proceeded to correspond with the
SUBJECT FACEBOOK ACCOUNT.

15. During the course of the April 28, 2011
correspondence between CS1 and Mckenzie via the SUBJECT FACEBOOK
ACCOUNT, McKenzie referenced the murders that he had previously
confessed to CS1 and also spoke about firearms. For example, in
response to CS1's inquiry as to why McKenzie has not been around,
McKenzie wrote, "i dnt like t.h.e.p.e.p.o.l.e around me\ na im
cumming 2 da petshop u no i no that i no that u no wat it do but
lets keep dat between me n u." Based on my training, experience
and the investigation thus far, I believe that McKenzie's
reference to what CS1 knows ("u no i no that i no that u no") is
a reference to McKenzie's confession about the murders and that
he wants CS1 to keep that information between them ("but lets
keep dat between me n u"). In addition, McKenzie also wrote "u

silly boy grip up or crip up liv by da sword die by the sword."
Based on my training, experience and the investigation thus far,
I believe that McKenzie's statement, "grip up," was a reference
to his gun, and when he said "sword" he also meant gun ("liv by
da [gun] die by the [gun].").

16.   Given that the user of the SUBJECT FACEBOOK
ACCOUNT told CS1 about his involvement in a drug robbery and in
two homicides and then subsequently referenced those crimes and
told CS1 to get a gun, there is probable cause to believe that a
search of the SUBJECT FACEBOOK ACCOUNT will lead to fruits and
instrumentalities of violations of Title 21, United States Code,
Sections 841, 846, 952 and 963, and Title 18, United States Code,
Sections 924(c), 924(j) and 1951.

### Conclusion

17.   Based upon the information set forth above,
there is probable cause to believe that a search of the SUBJECT
FACEBOOK ACCOUNT will contain evidence of violations of Title 21,
United States Code, Sections 841, 846, 952 and 963, and Title 18,
United States Code, Sections 924(c), 924(j) and 1951.

18.   For these reasons, I request authority to seize
images, all opened and unopened messages and other electronic
content stored in the SUBJECT FACEBOOK ACCOUNT to be searched
off-site in a controlled environment.  Federal law enforcement
officials will review the records sought by the search warrant

and will segregate any messages and content constituting evidence, fruits, or instrumentalities of violations of federal criminal law.

19.   Based on the facts set forth above, I believe there is probable cause to believe that on the computer systems owned, maintained, and/or operated by Facebook, there exists evidence and instrumentalities of violations of Title 21, United States Code, Sections 841, 846, 952 and 963, and Title 18, United States Code, Sections 924(c), 924(j) and 1951.  By this affidavit and application, I request that the Court issue a search warrant directed to Facebook allowing agents to search the e-mail and other information stored on its servers for the SUBJECT FACEBOOK ACCOUNT and seize the files specified in Attachment A.   A warrants will be faxed to Facebook personnel who will be directed to produce those accounts and files.

WHEREFORE, I respectfully request that a search warrant issue, pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. §§ 2703(a), authorizing agents of the FBI and other law enforcement agents, to search the contents of the SUBJECT FACEBOOK ACCOUNT, and therein to seize the items described in Attachment A all of which constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841, 846, 952 and 963, and Title 18, United States Code, Sections 924(c), 924(j) and 1951.

20. The United States further requests that pursuant
to the preclusion of notice provisions of 18 U.S.C. Section
2705(b), Facebook be ordered not to notify any person (including
the subscriber or customer to which the materials relate) of the
existence of this warrant until further notice. The United
States submits that such an order is justified because
notification of the existence of this warrant would seriously
jeopardize the ongoing investigation. Such a disclosure would
give the subscriber an opportunity to destroy evidence, change
patterns of behavior, notify confederates, or flee or continue
his flight from prosecution.

21. It is also respectfully requested that this Court
issue an order sealing, until further order of the Court, all
papers submitted in support of this application, including the
application and search warrant. I believe that sealing this
document is necessary because the items and information to be
seized are relevant to an ongoing investigation into the criminal
organizations as not all of the targets of this investigation
will be searched at this time. Based upon my training and
experience, I have learned that online criminals actively search
for criminal affidavits and search warrants via the internet, and
disseminate them to other online criminals as they deem
appropriate, e.g., by posting them publicly online through the

carding forums.  Premature disclosure of the contents of this
affidavit and related documents may have a significant and
negative impact on the continuing investigation and may severely
jeopardize its effectiveness.

SCOTT F. BYERS
Special Agent
Federal Bureau of Investigation


Sworn to before me this
29th day of April, 2011

Attachment A

List of Items to be Seized

All information described below for THE FACEBOOK ACCOUNT
ASSOCIATED WITH THE NAME MARS BOUND MCKENZIE (the "SUBJECT
FACEBOOK ACCOUNT") that constitutes fruits, evidence and
instrumentalities of violations of Title 21, United States Code,
Sections 841, 846, 952 and 963, and Title 18, United States Code,
Sections 924(c), 924(j) and 1951:

(a)   All contact information, including full name, user
identification number, birth date, contact e-mail addresses,
physical address (including city, state, and zip code), telephone
numbers, screen names, websites, and other personal identifiers.

(b)   All Photoprints, including all photos uploaded by the
SUBJECT FACEBOOK ACCOUNT and all photos uploaded by any user that
have that user tagged in them;

(c)   All Neoprints, including profile contact information;
Mini-Feed information; status updates; links to videos,
photographs, articles, and other items; Notes; Wall postings;
friend lists, including the friends' Facebook user identification
numbers; groups and networks of which the user is a member,
including the groups' Facebook group identification numbers;
future and past event postings; rejected "Friend" requests;
comments; gifts; pokes; tags; and information about the user's
access and use of Facebook applications;

(d)   All other communications and messages made or received by
the user, including all private messages and pending "Friend"
requests;

(e)   All IP logs, including all records of the IP addresses that
logged into the account;

(f)   All information about the user's access and use of Facebook
Marketplace;

(g)   The length of service (including start date), the types of
service utilized by the user, and the means and source of any
payments associated with the service (including any credit card
or bank account number);

(h)   All privacy settings and other account settings;

(i) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(j) Records relating to who created, used, or communicated with the SUBJECT FACEBOOK ACCOUNT, including records about their identities and whereabouts.